IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL L. GUIDRY,<br><br>    Plaintiff,<br><br>    v.<br><br>MARINE ENGINEERS' BENEFICIAL ASSOCIATION, et al.,<br><br>    Defendants.<br>_____/ | No. C 11-05347 CRB<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |

    This case, before the Court on a Motion for Summary Judgment, concerns a union member's allegation that the Marine Engineers' Beneficial Association ("MEBA") discriminated against him in failing to place him on a merchant ship, and failed to adequately investigate his grievance against the shipping company. Because the Plaintiff, Paul Guidry, has failed to establish a prima facie case of discrimination by MEBA, and has not met his burden of demonstrating a breach of MEBA's duty of fair representation, the Court GRANTS summary judgment in favor of MEBA.

/ /

/ /

/ /

/ /

## I. BACKGROUND[1]

On November 16, 2010, a MEBA dispatcher contacted Plaintiff Paul Guidry, an African American marine engineer and longstanding member of MEBA, to inform him of an available Third Assistant Engineer ("3AE") position that OSG Ship Management, Inc. ("OSG"), was seeking to fill on the Overseas Cascade, a ship operating in Brazil at the time. Guidry Decl. (dkt. 47-1) ¶¶ 1, 4, 5, 7. The dispatch sheet stated that the 3AE taking the job would join the ship on "approximately 12/25 or once [a] work visa has been attained," that the 3AE could not begin work without a Brazilian work visa, and that "[i]t takes approximately 45 days total to acquire a valid work visa." McCurdy Decl. (dkt. 43) Ex. A. The dispatcher informed Guidry that the ship needed a replacement engineer so that the 3AE currently on board, Frobenius, could return home to his pregnant wife. Guidry Decl. ¶ 7. According to Guidry, the dispatcher told Guidry that he would be dispatched on December 25. Id. However, Guidry admits that the dispatcher told him that the visa was necessary for the job and would take approximately 45 days to process.[2] Id.

Guidry accepted the job and submitted his passport and visa application to MEBA, which MEBA overnighted to OSG. Id. Guidry's passport photograph and other documents included in the application reveal that he is African American. Id. ¶ 8, Exs. (Dkt. 48-1) 1, 4. OSG sent the application materials to Mundivisas, a company it used to facilitate its Brazilian work visas. Id. ¶¶ 7, 9. Mundivisas later confirmed that it received Guidry's "complete documents" on November 18, 2010. Id. ¶ 9, Ex. 6.

Also on November 18, OSG reached out to Second Assistant Engineer (2AE) Matthew Boleza to fill a position on the Overseas Cascade. Id. ¶ 9. In addition to 3AE Frobenius, a 2AE named Alex Robinson was also scheduled to leave the ship in December.

//

---

[1] Unless otherwise specified, the facts stated here include Guidry's version of contested facts, as well as uncontested facts offered by MEBA. The Court assumes arguendo that some facts offered by Guidry and challenged by MEBA are admissible evidence, because, even accepting these facts, summary judgment for MEBA is warranted.

[2] Forty-five days from November 16 is December 31.

2

Gauslow Decl. (dkt. 44) ¶ 7.  Boleza had already applied for a Brazilian work visa.  Nolan Dep. (dkt. 51-4) at 45:21-22.  Boleza is Caucasian.  Guidry Decl. ¶ 10.

Although ships like the Overseas Cascade usually operate with only one 2AE and one 3AE, id. ¶ 16, the Overseas Cascade had two 2AEs[3] and one 3AE to provide "additional manpower" for the work it was doing in Brazilian coastal waters.  Gauslow Decl. ¶ 7; Nolan Dep. at 34:7-20.  However, it could remain in compliance with applicable cabotage laws (setting minimum crew requirements) with only two total engineers between these two positions.  Nolan Dep. at 40:12-15.

On December 11, 2AE Boleza boarded the ship, Guidry Decl. ¶ 15, and 2AE Robinson and 3AE Frobenius left the ship.  Nolan Dep. at 53:14-15, 55:18-19.  Guidry contends that after OSG learned that he was African American, OSG sought out Boleza to take the position Guidry was dispatched for.  Guidry Decl. ¶¶ 9-10.  MEBA has introduced evidence that Boleza relieved 2AE Robinson and that, although Boleza's arrival allowed 3AE Frobenius to leave the ship without violating cabotage laws, the 3AE position became vacant after Frobenius's departure and was held for Guidry pending the issuance of his work visa.  See Gauslow Decl. ¶ 7; Nolan Dep. at 40:12-15, 47:3-7, 49:13-25, 53:4-8; Nolan Decl. (dkt. 45) Ex. A.  It is not clear that Guidry has sufficient personal knowledge of Boleza's dispatch to give admissible testimony that Boleza took the same 3AE position for which Guidry was dispatched.  See Guidry Decl. ¶¶ 9-10.  However, summary judgment for MEBA is still appropriate even if the Court assumes arguendo that Guidry and Boleza were dispatched to the same position on the Overseas Cascade.

Guidry's visa approval encountered significant delays, during which he contacted MEBA and OSG multiple times.  Guidry Decl. ¶¶ 19-24.  Guidry again signed visa

//

//

//

---

[3] One 2AE position was held by Robinson and later Boleza; the other 2AE position was held by another engineer who is not named in the record and seems to have remained on the ship throughout the relevant time period.  See Gauslow Decl. ¶ 7.

3

application documents on or about January 25, 2011. Guidry Decl. ¶ 23; Gauslow Decl. ¶ 4.[4] On February 8, Guidry filed a grievance with MEBA. Guidry Decl. ¶ 26. He learned the next day that his visa had been approved by the Brazilian government and that his visa and passport were in the mail. Guidry Dep. (dkt. 42) at 174:20-23. A stamp on the visa showed that it was approved by the Brazilian government on February 1. Guidry Decl. ¶ 24. On February 11, Guidry turned down his pending dispatch to the Overseas Cascade because he believed that the crew of the ship would retaliate against him for filing a grievance. Id. ¶¶ 26-27. The same day, OSG received Guidry's passport and work visa from Mundivisas, sent them to Guidry via UPS, and booked an airline ticket for him to meet the Overseas Cascade. Gauslow Decl. ¶ 5. Guidry received his passport and visa from OSG on February 14. Id.; Guidry Decl. ¶ 28. After Guidry turned down the job, Helbert Esquival, another engineer, took the 3AE position on the Overseas Cascade. Guidry Dep. 111:14-112:5; Nolan Dep. 41:15-43:12.

MEBA Vice President Dave Nolan investigated Guidry's grievance against OSG. Guidry Decl. ¶¶ 36-37; Nolan Decl. ¶¶ 1, 10-12. MEBA's legal counsel and MEBA Patrolman Patrick Anderson assisted in the investigation. Nolan Dep. 16:8-17:2. Nolan discussed the case with Guidry, the MEBA dispatcher who dispatched Guidry, Patrolman Anderson, and OSG Vice President Norman Gauslow, but did not interview anyone else. Nolan Dep. 18:22-19:11. Anderson also contacted Fred Meyer at OSG. Guidry Decl. ¶ 22; see also Nolan Decl. Ex. G at MEBA000057 (letter from Meyer to Anderson referencing an inquiry from Anderson).

Gauslow, the OSG vice president, provided a set of documents to Nolan, including documents that OSG had prepared for the EEOC in response to a charge Guidry filed against OSG. Nolan Decl. ¶ 15 & Exs. C, G. Guidry also provided materials to Nolan, including an

---

[4] Guidry asserts that he was asked to fill out the same documents that he had submitted in November. Guidry Decl. ¶ 23. MEBA and OSG assert that Guidry signed a different document necessary to collect the visa. Gauslow Decl. ¶ 4. Which documents Guidry signed at this stage of the process is not a material fact: even accepting Guidry's version, summary judgment for MEBA is appropriate. The Court assumes for the purpose of this motion that Guidry was asked to resubmit the same documents.

email from Mundivisas stating that Mundivisas received all of Guidry's visa application materials on November 18. Nolan Decl. ¶ 14 & Ex. B; see also Guidry Decl. ¶ 9 & Ex. 6. Nolan sent Guidry a letter on August 18 stating that he had completed his investigation, determined that the visa delay was not the fault of OSG, and therefore concluded that the grievance lacked merit. Nolan Decl. ¶ 19 & Ex. H.

Guidry filed this action after receiving a right-to-sue letter from the EEOC. Guidry Decl. ¶ 56 & Ex. 23. His First Amended Complaint alleges that racial discrimination caused the delay in processing his work visa and motivated MEBA to dispatch Boleza to the Overseas Cascade in Guidry's place. FAC (dkt. 29) ¶ 46. MEBA moves for summary judgment on the grounds that Guidry has not established a prima facie case of discrimination, and even if he did, that he has failed to present evidence that MEBA's proffered nondiscriminatory explanations for the events are pretextual. Mot. (dkt. 41) at 10-11.

## II.   LEGAL STANDARD

Summary judgment is properly entered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). The movant bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). The movant is not required to produce evidence negating the non-movant's claims. See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888-89 (1990) ("[T]he purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues."). If the movant carries its burden, the burden shifts to the nonmoving party to establish facts beyond the pleadings showing that there remains a triable issue of disputed material fact so that summary judgment is not appropriate. Celotex, 477 U.S. at 324; Adickes, 398 U.S. at 157. "The district court need not examine the

entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." Carmen v. S.F. Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).

## III.   DISCUSSION

Summary judgment is appropriate in this case because Guidry admits that he was not qualified for the position until he had a Brazilian work visa and has presented no evidence that MEBA played any role in the delayed processing of his visa. As for Guidry's claims regarding MEBA's investigation of his grievance, summary judgment is appropriate because Guidry has not established that MEBA's conduct was discriminatory, arbitrary, or in bad faith.

### A.   There is No Evidence That MEBA Delayed Guidry's Dispatch

Guidry alleges that racial discrimination caused the delay in processing his work visa and caused MEBA to dispatch Boleza to fill the same position on the Overseas Cascade. FAC ¶ 46; see Guidry Decl. ¶ 49 ("MEBA dispatched a non African American to do a job for which MEBA had previously dispatched me to work.").

"The standard burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green applies to a Title VII action against a union." Beck v. United Food & Commercial Workers Union, Local 99, 506 F.3d 874, 882 (9th Cir. 2007) (citations omitted). If the plaintiff establishes a prima facie case of discrimination, "the burden of production shifts to the union to articulate a legitimate, non-discriminatory reason for the less favorable treatment." Id. at 883. If the union can articulate such a reason, the plaintiff then has the opportunity to show that the stated reason is pretextual. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804 (1973); Pejic v. Hughes Helicopters, Inc., 840 F.2d 667, 672 (9th Cir. 1988) (affirming summary judgment in favor of a defendant union).

In McDonnell Douglas, which concerned alleged discrimination in an employer's hiring decisions, the Supreme Court established the following elements for a prima facie case of Title VII discrimination:

//

> (i) that [the plaintiff] belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 796, 802.  The Ninth Circuit cited this standard in Beck, a Title VII case against a union, but adapted it because the alleged discrimination in that case involved the quality of representation, not a hiring decision.  See Beck, 506 F.3d 874, 882.[5]  For the purposes of Guidry's allegation that MEBA discriminated against him in its process of dispatching members to jobs, however, there is no reason to depart from the original McDonnell Douglas standard, because this is essentially a hiring decision.

      Guidry fails to establish a prima facie case of discrimination because he was not qualified to work on the Overseas Cascade until he had a valid Brazilian work visa.  See Guidry Decl. ¶ 7 ("[The MEBA dispatcher] said that I would have to obtain a special Brazilian work visa to work on the 'Overseas Cascade' . . . ."); Guidry Dep. at 15:2-5 ("Q: And that position required you to get a Brazilian work visa, correct? A: Correct."); Garea Decl. (dkt. 42) Ex. C (Guidry Responses to Requests for Admission) ("RFA").[6]  Further, OSG and MEBA did not "continue[] to seek applicants from persons of [Guidry's] qualifications."  See McDonnell Douglas, 411 U.S. at 802.  Even accepting Guidry's contention that Boleza was dispatched to fill the same job replacing 3AE Frobenius, see Guidry Decl. ¶ 10—which MEBA and OSG dispute, see Gauslow Decl. ¶ 7—Boleza had different qualifications than Guidry because it is undisputed that, at the time Boleza joined the Overseas Cascade, Boleza had a valid Brazilian work visa and Guidry did not.  Nolan Dep. at 45:21-22; Guidry Decl. ¶¶ 15, 24 (stating that Boleza joined the ship on December 11 and Guidry's visa was approved on February 1).  Even when OSG first reached out to Boleza

---

[5] "Adapting the McDonnell Douglas criteria to a § 703(c)(1) action, a union member can make a prima facie claim of discrimination by introducing evidence that the member 'was singled out and treated less favorably than others similarly situated on account of race or any other criterion impermissible under the statute.'"  Beck, 506 F.3d at 882 (citations and footnote omitted).

[6] "Request No. 5: Admit that in 2010 YOU were notified that YOU were required to obtained a Brazilian work visa prior to commencing work . . . . Response to Request No. 5: Yes, but even if I had a Brazilian work visa, I would not have gotten the job."  RFA at 5.

7

about the Overseas Cascade job, Boleza was already well into the process of obtaining a visa, unlike Guidry who had only just applied. See Nolan Dep. at 45:21-22.

Guidry therefore fails to establish the second and fourth elements of a prima facie case under McDonnell Douglas. See 411 U.S. at 802 ("(ii) that he . . . was qualified for a job . . . and (iv) that . . . the employer continued to seek applicants from persons of [Guidry]'s qualifications"). Alternatively, framing this issue in the language of Beck rather than McDonnell Douglas, Guidry fails to establish a prima facie case because he and Boleza were not "similarly situated" with respect to the work visa, and Guidry has presented no evidence as to the treatment of other engineers without Brazilian work visas. See Beck, 506 F.3d at 882.

The Court's analysis would be different if MEBA played a role in Guidry's visa being delayed, but Guidry has presented no evidence to that effect. According to Guidry's own declaration, a MEBA dispatcher overnighted Guidry's visa application to OSG after Guidry submitted it to her on November 17. Guidry Decl. ¶¶ 7, 24. Guidry also declares that when OSG told him on "January 24 or 25" that he needed to "redo the application," which he then signed at the MEBA union hall, OSG submitted the signed application to Mundivisas on January 25. Id. ¶¶ 22-24. This timing necessarily implies that MEBA sent the application to OSG promptly, if not immediately. When Guidry ultimately received his passport and visa, he received them directly from OSG, not through MEBA. Id. ¶ 28; Gauslow Decl. ¶ 5. The record thus demonstrates that MEBA's only role in Guidry's visa application consisted of twice promptly sending his application materials to OSG. MEBA therefore did not contribute to the delay in processing Guidry's work visa. Even if MEBA had been more involved in the visa process, Guidry admitted that he has no knowledge of whether his visa application process differed from that of any other MEBA engineer. Guidry Dep. at 42:9-22, 47:11-16.

//
//
//

The record demonstrates that Guidry and Boleza were not equally qualified for the position due to Guidry's lack of a work visa,[7] and that MEBA did not contribute to Guidry's visa being delayed. Guidry therefore fails to establish a prima facie case that MEBA's role in dispatching Boleza to the Overseas Cascade violated Title VII, or that MEBA played any role in delaying Guidry's dispatch. See McDonnell Douglas, 411 U.S. at 802.[8] The Court therefore GRANTS summary judgment as to this claim.

### B. MEBA Adequately Investigated Guidry's Grievance

Guidry also argues that MEBA failed to adequately investigate his grievance. Such a claim is cognizable as either a Title VII discrimination claim or a breach of the duty of fair representation. Because Guidry has produced no evidence that any defects in MEBA's investigation were discriminatory, arbitrary, or in bad faith, MEBA is entitled to summary judgment on these claims as well.

#### 1. MEBA Did Not Discriminate Against Guidry in Its Investigation

A union member can bring a Title VII claim against his or her union if the union fails to provide him or her with the same quality of representation that it provides to similarly situated union members who are not part of the same protected class. Beck, 506 F.3d at 882. "[A] union member can make a prima facie claim of discrimination by introducing evidence that the member 'was singled out and treated less favorably than others similarly situated on account of race or any other criterion impermissible under the statute.'" Id. (quoting Gay v. Waiters' & Dairy Lunchmen's Union, 694 F.2d 531, 537 (9th Cir. 1982)).

/ /

---

[7] Once Guidry obtained a work visa, OSG arranged for his travel to the ship, thus treating Guidry identically to Boleza at that time. See RFA at 14 (Request No. 26). There is no evidence that MEBA hindered or failed to facilitate Guidry's dispatch once he had a visa.

[8] One additional piece of evidence is worth mentioning. In response to a Request for Admission, Guidry states that "[t]he Captain and Chief Engineer of the Overseas Cascade said they did not want a black engineer on their ship," but provides no other details about the comment, does not discuss this allegation anywhere else in his Declaration or Oppositions, and provides no evidence that he shared these alleged statements with MEBA during MEBA's investigation of his grievance. RFA at 5 (Response to Request No. 5). In addition to possible hearsay issues, this allegation lacks sufficient foundation to be admissible, because Guidry provides no indication that he had personal knowledge of the alleged statement. Further, even if the statement were admissible, it does not support a claim of discrimination by MEBA.

9

Guidry alleges in his Complaint that MEBA "never actually investigated [his] case when [he] complained to them and filed a grievance." FAC ¶ 42. However, Guidry fails to make a prima facie showing of discrimination because he has produced no evidence pertaining to MEBA's handling of a grievance by any other member, whether or not a member of the same protected class. See Beck, 506 F.3d at 882 (requiring a showing that a plaintiff was "treated less favorably than others similarly situated); cf. id. at 885 (affirming judgment in favor of a female plaintiff who demonstrated that her union more aggressively represented similarly situated men than similarly situated women). Instead, Guidry's Supplemental Opposition includes only the conclusory statement that "MEBA's failure to reasonably investigate Guidry's grievance treated Guidry less favorably than its other members," with no citation to law or evidence. Suppl. Opp'n (dkt. 51) at 13. "Legal memoranda . . . are not evidence and do not create issues of fact capable of defeating an otherwise valid summary judgment." Estrella v. Brandt, 682 F.2d 814, 819-20 (9th Cir. 1982). Even if this statement had been in Guidry's declaration, it is "too conclusory to be cognizable" because it includes "only conclusions, and not such facts as would be admissible in evidence." See United States v. Shumway, 199 F.3d 1093, 1104 (9th Cir. 1999) (footnote and internal quotation marks omitted).

In his Declaration, Guidry points to an incident in which MEBA disciplined a dispatcher who assigned himself to a job that he then failed to report for, and argues that MEBA's failure to similarly discipline the dispatcher who sent Boleza to the Overseas Cascade evinces discrimination. Guidry Decl. ¶ 44 (citing an unspecified exhibit not filed with the Declaration); see also FAC ¶ 44 & Ex. 14. This comparison is inapposite. In the case at hand, no one dispatched himself or herself. Guidry Decl. ¶ 9 ("Fred Meyer of OSG and MEBA, arranged to pull Boleza . . . ."); id. ¶ 10 ("MEBA dispatched Matthew Boleza . . . ."); Guidry Dep. at 115:16-18 ("[D]o you contend that anyone in this lawsuit dispatched themselves anywhere? A: No."). Nor did Boleza fail to report to the Overseas Cascade. Guidry Decl. ¶ 15 ("On or about December 11, 2010, Boleza was taken onto the 'Overseas Cascade' . . . ."). There is also no evidence regarding the race of anyone involved in the

1 prior case of discipline that would suggest that Guidry's treatment here was motivated by
2 race.  See Guidry Decl. ¶ 44.

3 Because Guidry fails to establish that he was "singled out and treated less favorably
4 than others similarly situated on account of race," the Court GRANTS summary judgment in
5 favor of MEBA as to Guidry's Title VII claim regarding MEBA's investigation of his
6 grievance.

### 2. MEBA Did Not Breach the Duty of Fair Representation

8 Even without evidence of discrimination, a union can be liable for breaching its duty
9 of fair representation.  "The duty of fair representation is a judicially established rule
10 imposed on labor organizations because of their status as the exclusive bargaining
11 representative for all of the employees in a given bargaining unit."  Beck, 506 F.3d 874, 879
12 (quoting Peterson v. Kennedy, 771 F.2d 1244, 1253 (9th Cir. 1985)).  "[A] union breaches
13 the duty of fair representation when its conduct towards a member of the bargaining unit is
14 arbitrary, discriminatory, or in bad faith."  Marquez v. Screen Actors Guild, Inc., 525 U.S.
15 33, 44 (1998); see also Beck, 506 F.3d at 879.

16 Guidry does not explicitly cite this duty, but his claim that "MEBA never actually
17 investigated [his] case" could be construed as alleging such a violation.  See FAC ¶ 42; see
18 also Suppl. Opp'n at 11-12 ("MEBA failed to reasonably investigate Guidry's grievance
19 . . . .").  The record, however, does not support this claim.  As discussed above, Guidry has
20 not presented evidence of discrimination pertaining to MEBA's investigation of his
21 grievance.  Nor does the evidence show arbitrary or bad faith action.

22 If a union exercises judgment, rather than simply fails to perform a "procedural or
23 ministerial act," a court will not consider that judgment arbitrary unless it is "so far outside a
24 wide range of reasonableness" that such a conclusion is compelled.  Beck, 506 F.3d at 879
25 (citations omitted).  Under this deferential standard, Nolan's decision to end MEBA's
26 investigation was not "outside a wide range of reasonableness."  See id.

27 MEBA assigned Nolan, an executive vice president, to investigate Guidry's grievance,
28 and requested information from OSG about the circumstances of Guidry's delayed dispatch.

11

1 Guidry Decl. ¶¶ 36-37; Nolan Decl. ¶¶ 1, 10-12.  Nolan consulted with a MEBA patrolman
2 and legal counsel in his investigation.  Nolan Dep. at 16:8-17:2.  In addition to the documents
3 Nolan received from OSG, Guidry provided Nolan with an email from Mundivisas, the visa
4 processing agency, stating that Mundivisas received all of Guidry's application materials on
5 November 18, that the Brazilian Ministry of Labor had technical difficulties causing
6 significant delays in all visa applications, and that Boleza's visa was issued sooner than
7 Guidry's because Boleza submitted his application earlier.  Nolan Decl. ¶ 14 & Ex. B.[9]  This
8 email alone could provide a reasonable basis for Nolan's conclusion that the delayed visa,
9 and therefore Guidry's delayed dispatch, was outside of OSG's control.  See Nolan Decl.
10 ¶ 16 & Ex. H (letter from Nolan to Guidry explaining the decision not to pursue the
11 grievance).  Information provided by OSG regarding the visa process and OSG's efforts to
12 place Guidry on the Overseas Cascade after he obtained a visa further support Nolan's
13 conclusion.  Nolan Decl. ¶ 15 & Exs. C, G (including correspondence with Mundivisas and
14 confirmation of air travel for Guidry).[10]

15 Guidry argues that Nolan should have interviewed Boleza, Frobenius, the captain of
16 the Overseas Cascade, and the dispatcher who dispatched Frobenius.  Suppl. Opp'n at 13.  In
17 light of the materials he reviewed, Nolan's decision not to interview these individuals was
18 not "so far outside a wide range of reasonableness [as to be] wholly irrational or arbitrary."
19 See Beck, 506 F.3d at 879 (citation omitted); Nolan Dep. at 23:1-5 ("[Interviewing Boleza]
20 was unnecessary.").  Given Nolan's determination that OSG had no role in the delay of

---

[9] This email would be inadmissible as hearsay if introduced for the truth of the matter asserted, but is admissible to show what evidence Nolan reviewed in his determination that Guidry's grievance lacked merit.  The existence of this email is not in dispute: Guidry's Declaration confirms that he received it and attaches the same email, and Guidry does not dispute that he sent it to Nolan. See Guidry Decl. ¶ 9 & Ex. 6.

[10] As previously discussed, the Court can assume in the context of summary judgment that Guidry was required to resubmit his application in January 2011.  See Guidry Decl. ¶ 24.  This alone does not demonstrate wrongdoing by OSG: either Mundivisas or the Brazilian government could have caused the need for resubmission.  Even if the Court determined that OSG's misconduct led to Guidry's visa being delayed, that would not render Nolan's contrary conclusion unreasonable.  See Beck, 506 F.3d at 879 ("This deferential standard for arbitrary conduct 'gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong.'" (citation omitted)).

12

1  Guidry's visa, Nolan Decl. ¶¶ 16, 19 & Ex. H, it was not unreasonable to conclude that
2  further investigation of the circumstances of Boleza's dispatch was unnecessary. The
3  circumstances here are simply not comparable to cases where courts have found an arbitrary
4  failure to provide fair representation. Cf., e.g., Beck, 506 F.3d at 881 (failure to file a
5  grievance that the union agreed to file); Peters v. Burlington N. R.R. Co., 931 F.2d 534, 541
6  (9th Cir. 1990) (failure to research basic provisions of a controlling collective bargaining
7  agreement).

8  Finally, Guidry has not presented evidence of bad faith by MEBA. "To establish that
9  the union's exercise of judgment was in bad faith, the plaintiff must show 'substantial
10 evidence of fraud, deceitful action or dishonest conduct.'" Beck, 506 F.3d at 880 (citation
11 omitted). "[A] disagreement between a union and an employee over a grievance, standing
12 alone, [does not] constitute evidence of bad faith, even when the employee's grievance is
13 meritorious." Moore v. Bechtel Power Corp., 840 F.2d 634, 637 (9th Cir. 1988). Guidry's
14 only allegation that approaches "fraud, deceitful action or dishonest conduct" by MEBA, see
15 Beck, 506 F.3d at 880, is that "MEBA officials denied that the job had been filled and told
16 Guidry that the 'Overseas Cascade' was sailing short an assistant engineer." Suppl. Opp'n at
17 10; see also Guidry Decl. ¶ 20 ("[A MEBA agent] told me he did not believe the job had
18 already been filled [and] did not tell me MEBA dispatched Boleza on December 11 . . . .").
19 Guidry provides no evidence of dishonesty, i.e., that the agent knew the position was filled,
20 knew of Boleza's dispatch, or had reason to believe that Boleza's dispatch was related to
21 Guidry's delay.[11]

22 Because Guidry has not presented "substantial evidence" of deceit or dishonesty, he
23 has not met his burden of establishing bad faith in MEBA's representation. See Beck, 506
24 F.3d at 880. In contrast, the evidence suggests a good faith effort by Nolan and Anderson,
25 the MEBA patrolman, to investigate Guidry's claims. See, e.g., Nolan Decl. Ex. F (letter

---

[11] Guidry's conclusory statement that the agent "knew or should have known at the time that MEBA had dispatched Boleza" is not admissible evidence due to lack of foundation and personal knowledge. See Guidry Decl. ¶ 20. Even if this statement were credited, it does not show that the agent knew or believed that Boleza was dispatched to the same position as Guidry or that Boleza's dispatch was otherwise relevant to Guidry's circumstances.

13

from Nolan to OSG Vice President Gauslow requesting information regarding Boleza's dispatch).

Guidry fails to present evidence that MEBA's representation of him was discriminatory, arbitrary, or in bad faith. The Court therefore GRANTS summary judgment in favor of MEBA as to Guidry's claims relating to inadequate representation or investigation.

### C.     Other Disputed Facts

The parties dispute a number of facts not addressed in detail above, including whether Boleza was dispatched to the same position as Guidry, whether the Boleza dispatch complied with MEBA rules and practice, and whether Guidry had to resubmit the same application materials in January that he submitted to OSG in November. However, even viewing these facts in the light most favorable to Guidry,[12] Guidry fails to establish a prima facie case that MEBA discriminated against him, and fails to establish a breach of the duty of fair representation.

## IV.    CONCLUSION

For the foregoing reasons, the Court hereby GRANTS Defendant MEBA's Motion for Summary Judgment.

**IT IS SO ORDERED.**

Dated: March 8, 2013              CHARLES R. BREYER
                                  UNITED STATES DISTRICT JUDGE

---

[12] For this analysis, the Court can also assume arguendo that Guidry's declarations as to these disputed facts have sufficient foundation and personal knowledge to be admissible evidence.